**ROOSEVELT IRRIGATION DISTRICT, a political subdivision of the State of Arizona, Plaintiff,**

v.

**SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, et al., Defendants.**

No. 2:10–CV–00290 DAE–BGM.

United States District Court, D. Arizona.

Signed Aug. 19, 2014.

Andrew S. Friedman, Francis Joseph Balint, Jr., Jerry C. Bonnett, Andrew Q. Everroad, Bonnett Fairbourn Friedman & Balint PC, Phoenix, AZ, for Plaintiff.

Lea Alexandra Phillips, Craig Carson Hoffman, David John Armstrong, Ballard Spahr LLP, Phoenix, AZ, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFEN-DANTS' RULE 12(B)(6) MOTION TO DISMISS*

DAVID ALAN EZRA, Senior District Judge.

On July 29, 2014, the Court heard a Motion to Dismiss Plaintiff Roosevelt Irri-gation District's ("RID") amended com-plaint. The motion was brought by Defen-dants Kinder Morgan Energy Partners, LP ("Kinder Morgan"), Alcoa Inc. ("Al-coa"), Arizona Public Service Company ("APS"), ArvinMeritor, Inc. ("ArvinMeri-tor"), Nucor Corporation ("Nucor"), Pru-dential Overall Supply ("Prudential"), Semiray Inspection Services, Inc. ("Semi-ray"), and Textron, Inc. ("Textron") (col-lectively, "Moving Defendants"). Jerry C. Bonnett and Francis J. Balint, Jr., Esqs., appeared at the hearing on behalf of the Plaintiff; C. Scott Spear, Matthew G. Ball, John M. Barkett, David J. Armstrong, Ashley M. Gomez, Scott K. Ames, Jerry W. Ross, Matthew Bingham, Joseph Dra-zek, Troy Froderman, Shane Swindle, Sean Morris, Jerry D. Worsham II, Mitch-ell J. Klien, Stephen Crofton, Ann Ugliet-ta, Marc Gans, Michael P. Berman, James G. Speer, Coree Neumeyer, Esqs., ap-peared at the hearing on behalf of Defen-dants, and Kevin E. Vickers and Carlo A. Consoli, Esqs., appeared telephonically on behalf of Defendants. After careful con-sideration of the memoranda in support of and in opposition to the Motions, and in light of the parties' arguments at the hear-ing, the Court, for the reasons that follow, **GRANTS IN PART AND DENIES IN PART** Moving Defendants' motion.

## BACKGROUND

This is a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. ("CERCLA") whereby Plaintiff Roosevelt Irrigation Dis-trict ("RID") seeks to recuperate the costs it has or will incur in responding to the contamination of its wells and to recover for damages to RID property. RID is a political subdivision of the State of Ari-

zona, and it owns multiple groundwater wells in the western portion of Maricopa County, Arizona, used to provide water to public and private entities and individuals. ("TAC," Dkt. # 789 ¶¶ 7, 9, 38.) RID currently pumps groundwater from its wells and transports it through a network of canals for agricultural, landscape watering, and municipal use on land located within the District. (*Id.* ¶ 39.)

Over twenty of RID's groundwater wells have been impacted by hazardous substances known as chlorinated volatile organic compounds ("VOC Contaminants" or "VOCs"). (*Id.* ¶ 40.) These VOCs include, but are not limited to, trichloroethene ("TCE"), also known as trichloroethylene; tetrachloroethene ("PCE"); 1, 1, 1–trichloroethane ("TCA"); 1, 1–dichloroethane ("1, 1–DCA"); 1, 1–dichloroethene ("1, 1–DCE"); 1, 2–dichloroethane ("1, 2–DCA"); and cis–1, 2–dichloroethene ("cis–1, 2–DCE").[1] (*Id.* ¶ 40.) These VOC contaminants are designated as "hazardous substances" under CERCLA and are considered by the Environmental Protection Agency ("EPA") to be severely harmful to human health and the environment. (*Id.* ¶ 41.) Although not all of RID's groundwater wells have been impacted by the VOC Contaminants, RID contends they are threatened by the same substances. (*Id.*)

RID did not release any of the VOC Contaminants into its groundwater wells. Rather, the hazardous substances in and threatening RID's groundwater wells are the result of releases from facilities owned or operated by other parties that flowed into and contaminated the groundwater supplying RID's wells. (*Id.* ¶ 41.)

In 1986, the Arizona Legislature established the Arizona Department of Environmental Quality ("ADEQ") in response to growing concerns over groundwater quality. (*Id.* ¶ 42.) The ADEQ is the state regulatory agency charged with responsibility to investigate groundwater contamination and enforce Arizona's environmental laws. After groundwater contamination was detected at a facility in west Phoenix, ADEQ began conducting a groundwater investigation that led to the establishment of the West Van Buren Area ("WVBA") Water Quality Assurance Revolving Fund ("WQARF") Site ("WVBA WQARF Site"). (*Id.* ¶ 43.) The contaminated groundwater wells owned and operated by RID (and the wells threatened by the VOC Contaminants) are within the WVBA WQARF Site. (*Id.*)

In August 2012, after years of extensive field and work analysis, the ADEQ issued a final report entitled "Remedial Investigation Report, West Van Buren WQARF Registry Site" (the "WVBA RI Report"). In the WVBA RI Report, the ADEQ concluded that the groundwater contamination in the WVBA (where RID's groundwater wells are located) "is the areal projection of the western portion of a large commingled plume of contaminated groundwater in Phoenix, Arizona," and that "[c]ontributors to this commingled plume include industrial facilities and contaminated groundwater from the east, as regional groundwater flow is generally westward." (*Id.* ¶ 45.)

Specifically, the WVBA RI Report concluded that "[g]roundwater contamination enters the WVBA from the east from the Motorola 52nd Street Federal Superfund Site OU3 area." (*Id.* ¶ 46.) The Motorola 52nd Street Superfund Site ("M–52 Site") was established by the EPA in 1989 after

---

**1.** In the 1950s and '60s, extensive industrial usage of chlorinated organic solvents such as PCE and TCE was widespread until the use of these compounds arose human health and environmental concern in the 1970s and 1980s.

an investigation revealed massive groundwater contamination originating from the 52nd Street Motorola Plant. The EPA, in its findings of fact entered in connection with the M–52 Site, found that "[g]roundwater contaminated with VOCs from the Motorola and Honeywell Facilities, as well as other potential sources within OU1 and OU2 commingle and flow westward into OU3, where it commingles with contamination from sources within OU3." (*Id.* ¶ 46.)

The ADEQ also concluded in the WVBA RI Report that "[c]ontaminated groundwater also appears to enter the WVBA from the north in the central portion of the site from the West Osborn Complex (WOC) WQARF Registry Site." The West Osborn Complex WQARF Site ("WOC WQARF Site") is part of the West Central Phoenix Area WQARF Sites, which are located adjacent to and directly north of the WVBA. (*Id.* ¶ 47.)

RID alleges that the contamination and threatened contamination of RID's wells is associated with facilities located within three regional sites which have been identified under CERCLA, 42 U.S.C. §§ 9601 to 9675, or Arizona's WQARF program, A.R.S. §§ 49–281 to 49–298. (*Id.* ¶ 48.) The three regional sites are: (1) the Motorola 52nd Street Superfund Site, (2) the West Van Buren Area WQARF Site, and (3) the West Central Phoenix Area WQARF Sites. (*Id.*) Each of these regional sites is defined with boundaries.

RID alleges that the VOC Contaminants impacting or threatening to impact RID's groundwater wells emanate from these three regional sites and have formed a commingled plume of VOC Contaminants. (*Id.* ¶ 50.) The studies conducted on these sites indicate that a wide range of industries operating in these three areas used large quantities of chlorinated solvents such as PCE and TCE. (*Id.*) The use of chlorinated solvents and the waste management practices of these facilities are responsible for the VOC contamination of soil and groundwater in the area encompassed by the three regional sites. (*Id.*) RID alleges that prior to the 1980s, many of these facilities developed on-site waste disposal systems that discharged waste directly to permeable subsurface sediments for disposal. (*Id.*) These wastes containing VOCs contaminated the groundwater through vertical contaminant transport through the unsaturated zone into the groundwater. (*Id.* ¶ 51.) According to the ADEQ's WVBA RI Report, once VOCs are released to the soil, unsaturated flow is

> primarily downward until either a change in lithology or the groundwater table is encountered. As a result of this primarily vertically downward migration, unsaturated flow occurs at or near the source area. As vadose zone soils within the WVBA are generally permeable, unsaturated flow in the WVBA typically continues to the groundwater table.

(*Id.* ¶ 52.)

Also according to the ADEQ's WVBA RI Report, upon reaching the groundwater table, the VOC Contaminants dissolve into the uppermost aquifer where groundwater movement within the region is predominantly controlled by RID's well-pumping. (*Id.* ¶ 54.) The contaminated groundwater in all three regional sites is hydrologically connected to the groundwater pumped by RID. (*Id.*) Thus, the commingled plums of contaminated groundwater underlying the M–52 Site and the WCP Area Sites flow toward and enter the WVBA Site in response to RID's well-pumping from groundwater wells located in the WVBA Site. (*Id.*) According to RID, the WVBA WQARF Site and the adjacent WCP Area Sites and M–52 Site are all impacted by multiple VOC Contaminants forming a large, commingled plume that is "collec-

tively one of the largest contaminant plumes in the country." (*Id.* ¶ 55.)

RID alleges that contaminated groundwater from the three regional sites has impacted more than twenty of RID's groundwater wells and threatens to impact a number of additional groundwater wells that are located along the southern and western plume margins. (*Id.* ¶ 56.) This contamination restricts RID's ability to utilize its developed groundwater resources for their reasonably foreseeable use as a municipal water supply. (*Id.*)

According to the WVBA RI Report, the following Defendants [2] are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater of the WVBA or that owned or operated facilities that released Contaminants under conditions evidencing that VOC Contaminants were released into the groundwater of the WVBA: Alcoa/Reynolds, Prudential Overall Supply, and Kinder Morgan. (*Id.* ¶ 58.)

The following Defendants are identified as current or former owners or operators of facilities that released VOC Contaminants into the groundwater of the M–52 Site, which commingled and flowed into the groundwater of the WVBA: Meritor, APS, and Semiray. (*Id.* ¶ 59.)

The following Defendants are identified as current of former owners or operators of facilities that released VOC Contaminants into the groundwater within the WCP Area, which commingled and flowed into the groundwater of the WVBA: Nucor and Textron. (*Id.* ¶ 60.)

To respond to the contamination and threatened contamination of RID's wells, RID voluntarily entered into an Agreement to Conduct Work between ADEQ and RID on October 8, 2009. (*Id.* ¶ 64.) The Agreement was to conduct (a) an Ear-

ly Response Action ("ERA") to address certain RID groundwater wells and (b) a Feasibility Study for the WVBA WQARF Site. (*Id.*) Pursuant to the Agreement, RID has hired consultants to investigate, monitor, assess and evaluate the groundwater contamination and its sources and to design an ERA with the objective of removing VOC Contaminants that are impacting eight of the most highly contaminated groundwater wells within the WVBA Site.

RID alleges that the ERA is authorized under A.A.C. § R18–16–405 because it will provide a water supply by providing treatment at the most highly contaminated RID wells to remove VOCs that are contaminants of concern in groundwater within the WVBA Site, where RID's wells are located. (*Id.* ¶ 67.) RID contends that the ERA is "necessary" not only because wells are currently impacted, but also because additional RID wells are "threatened" by VOC contamination. (*Id.* ¶ 68.)

On February 4, 2010, RID submitted a revised ERA Work Plan to ADEQ. (*Id.* ¶ 70.) The revised ERA Work Plan was approved by the ADEQ on June 24, 2010. (*Id.* ¶ 73.) On September 2, 2011, ADEA approved a voluntary RID proposal for development and implementation of a wellhead treatment systems pilot initiative, the "RID–95 Wellhead Pilot Treatment System Proposal," which was designed to pump and treat contaminated groundwater for four of the most highly contaminated RID wells. (*Id.* ¶ 75.) The RID–95 Wellhead Pilot Treatment System initiative was designed to (a) evaluate the effectiveness of liquid-phase granular activated carbon treatment technology in removing the mixture of VOCs present in the WVBA, (b) evaluate two types of liquid-phase granular activated carbon treatment for effective-

**2.** For purposes of Order, only the Moving Defendants are discussed.

ness and efficiency, (c) evaluate the feasibility and constraints of wellhead treatment in lieu of more expensive centralized treatment, and (d) refine the capital and operation and maintenance costs estimates with the ultimate intention of reducing ERA response costs. (*Id.*)

On July 17, 2012, RID submitted a proposal to ADEQ to modify the ERA Work Plan and also submitted a Work Plan for implementation of the Modified ERA on January 24, 2013. The Modified ERA ("MERA") was approved by ADEQ on February 1, 2013, and reduces the capital and operation and maintenance costs of the ERA by as much as fifty percent. (*Id.* ¶ 77.)

RID filed a CERCLA action, asserting a § 107 cost-recovery claim to designate multiple Defendants as potentially responsible parties ("PRP") pursuant to CERCLA to recoup its costs incurred in responding to the contamination. Moving Defendants have filed the instant Motion to Dismiss, arguing that RID's action should be dismissed for failure to state a claim. (Dkt. # 732.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Dismissal under Fed.R.Civ.P. 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir.2008). Review is limited to the contents of the complaint and matters properly subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). In analyzing a motion to dismiss for failure to state a claim, the court accepts all well-

pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss. *See Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955 (2007). In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action. *See id.* at 556–57, 127 S.Ct. 1955. "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (internal quotations and citations omitted). But "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Ove v. Gwinn,* 264 F.3d 817, 821 (9th Cir.2001)

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly,* 550 U.S. at 558, 127 S.Ct. 1955 (citation omitted).

## ANALYSIS

I. *Moving Defendants' Joint Arguments*

CERCLA "generally imposes strict liability on owners and operators of facili-

ties at which hazardous substances were disposed." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (quoting *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1357 (9th Cir.1990)). "To achieve that end, CERCLA 'authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation.'" *Id.*

To establish a prima facie case under § 9607(a), the plaintiff must show that (1) there is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan"; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a). 42 U.S.C. § 9607; *see Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir.2006); *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.1989). In other words, in order to recover their response costs, RID must establish that: (1) the VOC Contaminants are hazardous substances; (2) there has been a release of VOC Contaminants at Defendants' respective facilities; (3) the release or threatened release caused RID to incur necessary response costs consistent with the National Contingency Plan ("NCP"); and (4) Defendants are within one of four classes of persons subject to CERCLA's liability provisions. *See Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir.2006)

### A. *Whether RID has adequately pled "facilities"*

Moving Defendants first argue that RID fails to allege the first element of its CERCLA claim—that the site where haz-

ardous substances are contained is a "facility." (Dkt. # 732 at 6.) Specifically, Moving Defendants argue that RID, in effect, claims that any release of hazardous substances from any of the twenty-six defendants within in the boundaries of the three Regional Sites has impacted or will impact the MERA Wells (*id.*); however, Moving Defendants argue that CERCLA's liability provisions are based on the definition of a "facility," and not on a broad term such as "Regional Sites" used by RID. (*Id.*) Additionally, Moving Defendants argue that RID neither alleges facts concerning the size or location of the Moving Defendants' facilities nor claims that any of the eight MERA wells are located within the boundaries of, or affected by, any specific facility. (*Id.*) Thus, Moving Defendants argue that RID's "claim that all twenty-six defendants are responsible for contamination at their respective sites, even if true, fails to provide any nexus between the Moving Defendants' operations and the eight MERA wells." (*Id.* at 7.)

Moving Defendants misconstrue the law as it relates to facilities and improperly conflate the "facility" element of a CERCLA claim with the element of causation. As discussed above, to demonstrate a prima facie case under § 9607(a), a plaintiff must show that the property is a "facility" as defined in 42 U.S.C. § 9601(9). 42 U.S.C. § 9607; *see Carson Harbor Vill.*, 433 F.3d at 1265; *Ascon Props.*, 866 F.2d at 1152. Section 9601(9) defines "facility" as

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or other-

wise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). Moving Defendants argue that the WVBA Site and other regional sites do not constitute a "facility" as defined by CERCLA. (Dkt. # 732 at 6 ("In effect, the Irrigation District claims that any release of hazardous substances from any of the 26 defendants within the boundaries of the three Regional Sites has impacted or will impact the MERA Wells. However, CERCLA's liability provisions are based on the definition of "facility"— not some broad term such as "Regional Sites" as used by the Irrigation District....").) Defendants' argument, however, misses the mark. While the WVBA Site and other regional sites may indeed constitute a "facility" for purposes of § 9601(9) under subsection (B), RID has set forth facts alleging that Defendants' various places of business are facilities.

Here, RID has alleged that the sites of each Defendants' various properties where VOC Contaminants were disposed of constitute "facilities" as that term is defined. While the WVBA site and the other regional sites at issue here could meet the definition of a "facility" in that they are "site[s] or area[s] where a hazardous substance has ... otherwise come to be located," RID has alleged that each of the Moving Defendants' places of business are "facilities" as defined by § 9601(9). Thus, in order to recover their response costs, RID must first establish that there has been a release of VOC Contaminants at Defendants' "respective facilities." *See Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.Supp.2d 1053, 1059 (C.D.Cal. 2003).

Informed by the Supreme Court's remarks that "the term 'facility' enjoys a broad and detailed definition," *United States v. Bestfoods,* 524 U.S. 51, 56, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), the Court concludes that Plaintiff has adequately alleged a "facility" as defined by 42 U.S.C. § 9601(9). *See Sierra Club v. Seaboard Farms,* 387 F.3d 1167, 1174 (10th Cir.2004) ("[T]he circuits that have applied the defined term 'facility' have done so with a broad brush."); *Uniroyal Chem. Co., Inc. v. Deltech Corp.,* 160 F.3d 238, 245 (5th Cir.1998) ("In examining the contours of § 9601(9), it is apparent that facility is defined in the broadest possible terms, encompassing far more than traditional waste sites. It expressly includes buildings, pipelines, motor vehicles, rolling stock, wells, and aircraft."); *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.,* 915 F.2d 1355, 1360 n. 10 (9th Cir.1990) ("[T]he term 'facility' has been broadly construed by the courts, such that 'in order to show that an area is a 'facility,' the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there.'" (quoting *United States v. Metate Asbestos Corp.,* 584 F.Supp. 1143, 1148 (D.Ariz.1984))).

As to each Moving Defendant, RID has alleged with particularity the use and alleged release of VOC Contaminants at an identified site/facility either currently or formerly owned by it; further, RID cites to the particular administrative report confirming the release of VOC Contaminants at that "facility." The Court will address the allegations as to each Moving Defendant each in turn:

### a. Alcoa [3]

As to Alcoa, RID has alleged that Alcoa owns and/or owned an aluminum extrusion

---

**3.** Pursuant to Rule 201 of the Federal Rules of Evidence, the Court grants Alcoa, Inc.'s

Request for Judicial Notice (Dkt. # 736), and takes judicial notice of the fact that Reynolds

facility on 320 acres between 35th Avenue and 43rd Avenue, located within the WVBA Site. (TAC ¶ 82; *id.* ¶ 58.) Specifically, citing the WVBA RI Report, RID alleges that two different degreasing processes were used in the plant: Stoddard solvent and vapor recovery. (*Id.* ¶ 83.) The Stoddard solvent system was operated until the early 1970s and the vapor recovery degreasing unit was installed as a replacement for the Stoddard solvent degreasing process. (*Id.*) The vapor recovery degreasing unit was used until the plant closed in 1983. (*Id.*) RID alleges that this facility is one of the nine most significant contaminant sources in the WVBA Site and PCE, TCE, and TCA were detected in soil and soil gas samples beneath the property. (*Id.* ¶ 85.) Specifically, the highest VOC concentrations were detected in the vicinity of the Stoddard solvent dip tank. (*Id.*)

### b. *Prudential Overall Supply*

As to Prudential Overall Supply ("POS"), RID has alleged that it operates an industrial laundry and dry cleaning operation at 5102 West Roosevelt Street, located within the boundaries of the WVBA Site. (*Id.* ¶¶ 138, 58.) RID alleges that PCE, a VOC Contaminant, was used as the dry cleaning solvent during the operations between 1982 and 1992. (*Id.* ¶ 139.) Specifically, RID contends that PCE was contained in a 750–gallon capacity internal tank house in the dry cleaning machine, and drums containing PCE sludge were stored in the dry cleaning room. (*Id.*) Additionally, a solvent containing PCE was used in a small parts washer located in the automotive garage. (*Id.*) Three drywells were located on site to drain storm water from the paved areas of the facilities, and the drywells were closed in 1995 and con-

verted to catch basins. (*Id.*) According to the WVBA RI Report, POS is one of the nine most significant contaminant sources in the WVBA Site and PCE has been detected in both soil and soil gas samples and is present in elevated concentrations beneath a majority of the site. (*Id.* ¶ 141.) Also according to the WVBA RI Report, "releases of PCE occurring at the POS facility contaminated groundwater beneath the facility and migrated downgradient of the facility." (*Id.*)

### c. *Kinder Morgan*

As to Kinder Morgan, RID alleges that Kinder Morgan owns property located at 10 S. 51st Avenue in Phoenix, Arizona, which is within the WVBA Site. (*Id.* ¶ 169.) The Kinder Morgan property was leased to the Union Oil Company of California, now Union Oil. Kinder Morgan became the successor-in-interest to Sante Fe Pacific Pipelines, L.P., ("SFPP") following its 1997 acquisition of SFFP. (*Id.*) RID alleges that Kinder Morgan leased bulk petroleum product storage and distribution terminals in an area known as the "Van Buren Tank Farm." (*Id.* ¶ 170.) According to the WVBA RI Report, the Union Oil facility was situated on land leased to SFFP prior to Kinder Morgan's acquisition and samples obtained from an evaporation pond and process water at the facility were found to contain VOC Contaminants. (*Id.*)

### d. *Meritor*

As to Meritor, RID alleges that Meritor formerly owned and operated a facility at 500 South 15th Street, within the OU3 section of the M–52 Superfund Site. (*Id.* ¶ 209.) The facility is situated on approximately twenty-eight acres zoned for "Heavy Industrial" use, and contains several buildings that were formerly used for

Metal Company is a wholly owned subsidiary of Alcoa. This is evidenced by Reynolds' Form 8–K announcing its May 3, 2000 merg-

er with Alcoa, which was filed with the Securities and Exchange Commission on May 15, 2000.

manufacturing, storage, administration, and maintenance. (*Id.*) According to the "15th Street Facility RI Report," large quantities of solvent usage and numerous potential source areas have been identified with the facility including former solvent storage areas, hazardous waste storage areas, and wastewater disposal facilities. (*Id.* ¶ 211.) RID further alleges that waste streams generated on-site contained metals, paint wastes, thinners, solvents and used oil, and the wastewater from manufacturing processes were at one time discharged to floor drains connecting to septic systems and cesspools for subsurface disposal. (*Id.*) According to the 15th Street Facility RI Report, VOC Contaminants including TCE, PCE, and 1, 1–DCE are present in the soil and soil gas beneath the facility, TCE and TCA are present in the sediment samples at the bottom of drywells on the facility premises, and PCE and TCA is present in soil gas samples in the vicinity of leaking sewer lines. (*Id.* ¶ 212.) Further, the WVBA RI Report has identified the 15th Street Facility as a potential source of the hazardous substances that have been released and have migrated into the WVBA site, thus affecting RID's wells. (*Id.*)

### e. *Arizona Public Service*

As to APS, RID alleges that APS owns and operates: (1) a facility located at 501, 502, and 505 South 2nd Avenue, and (2) a power plant and chemical lab at 408 and 410 South 43rd Avenue. (*Id.* ¶ 216.) RID alleges that the 2nd Avenue facility is located in the westernmost OU3 portion of the M–52 Superfund Site, just east of the WVBA Site. (*Id.*) At the 2nd Avenue facility, APS operated a maintenance facility containing an automotive repair shop, a transformer cleaning shop, paint and carpentry shops, and other "operation support functions." At these facilities, RID alleges that APS used chlorinated solvents, including PCE, TCE, and TCA in the maintenance area to repair, maintain, lubricate, degrease, and clean automotive parts, amongst other activities. (*Id.*) Further, RID alleges that regulatory reports identify APS as a current or former owner or operator of facilities that released VOC Contaminants into the groundwater of the M–52 Superfund Site, which comingled and flowed into the groundwater of the WVBA. (*Id.* ¶ 59.) RID alleges that groundwater in the vicinity of the APS facility migrates in a westward direction towards RID's groundwater wells in the WVBA. (*Id.* ¶ 219.)

### f. *Semiray*

As to Semiray, RID alleges that Semiray owns and/or operates a 1.75–acre facility on four adjacent parcels of property located at 3025 East Washington Street, 3027 East Washington Street, 13 South 30th Street, and 3052 East Madison Street, all of which are located within the OU2 portion of the M–52 Superfund Site. (*Id.* ¶ 260.) Semiray currently leases the facility, which was previously operated by Joray Corporation, who operated a service, inspection and testing facility for the aerospace industry under the name Kachina Testing Laboratories. (*Id.* ¶ 261.) RID alleges that the operations conducted by Joray used a wide variety chemicals that contained VOCs, metals and other constituents. (*Id.*) The main building on the Semiray/Joray facility was a 17,850 square foot building on the 3027 East Washington parcel; this main building included a chemical processing area, vapor degreasers, and a chemical laboratory and clean room. (*Id.* ¶ 262.) Facilities outside the main building including segregated chemical/material/waste and general storage areas, a wastewater treatment plant, reverse osmosis system, air scrubber unit, storm water collection chamber, and two drywells. (*Id.*) RID alleges that four to five

gallons of TCE were released into one of the drywells in 1989. (*Id.* ¶ 263.) Sediment samples obtained from the drywell confirm that a release or releases of TCE and TCA has occurred in the past. (*Id.*) RID alleges that according to the "June 2012 ADEQ/EPA Notice—Upcoming Environmental Work at the Semiray Facility," investigations revealed "extremely high" levels of PCE and TCE, including PCE concentrations of 100,000 times greater than EPA health-based screening level. (*Id.* ¶ 266.)

### g. Nucor and Textron

As to Nucor and Textron, RID alleges that both entities formerly owned and operated a 15–acre property at 3536 West Osborn Road, which is located in the WOC WQARF Site. (*Id.* ¶¶ 287, 293.) RID alleges that Nucor used TCE as a solvent in manufacturing electronic components and conducting manufacturing operations at the site between 1962 and 1965, and Textron used TCE as a solvent in manufacturing electronic components at the same site between 1959 and 1962. (*Id.*) RID alleges that according to the WOC RI Report, waste disposal at the site consisted of septic tanks and seepage pits, and high concentrations of TCE were present in samples of the septic tank contents. (*Id.* ¶¶ 288, 294.) Also, RID alleges that the WOC RI Report also indicates that TCE and lesser concentrations of PCE and 1, 1–DCE are present in both soil and soil gas samples obtained over widespread areas of the site. (*Id.* ¶¶ 289, 295.) RID further alleges that the WVBA RI Report confirms that contaminated groundwater associated with the upgradient WOC Site is entering the WVBA from the north. (*Id.* ¶¶ 290, 296.)

In sum, as to each Moving Defendant, RID has alleged a "facility" as it is defined by § 9601(9). A "facility" is a "building [or] structure ... or any site or area where a hazardous substance has been deposited, stored, [or] disposed of...." 42 U.S.C. § 9601(9). RID has sufficiently alleged a "facility" within these terms, identifying the location of each site by providing addresses of each, and describing with particularity the various structures and operations conducted on each site.[4] *See New York v. Adamowicz III,* 16 F.Supp.3d 123, 127–29, No. 02–3476(TLM), 2014 WL 1672550, at *3–4 (E.D.N.Y. April 25, 2014) (concluding a "site" was a facility, including "the leaching pool, overflow pool, pipe, slab area beneath the drum storage area," and describing the site by acreage and address); *see also Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.,* 791 F.Supp.2d 431, 475 (D.S.C.2011) *aff'd sub nom. PCS Nitrogen Inc. v. Ashley II of Charleston*

---

4. Although Moving Defendants argue that RID has not alleged "the size or location of Moving Defendants' facilities," Moving Defendants fail to point the Court to any case law standing for the proposition that size and location of the facility must be pled beyond what RID has included in its TAC. Moving Defendants argue that although the TAC "identifies specific addresses and descriptions of the alleged facilities and alleges that releases occurred at those locations," RID's pleading is nonetheless deficient. (Dkt. # 769 at 9.) Although Moving Defendants argue that "[a] facility cannot be defined solely on the basis of its street address," and the facility "must also be defined by the footprints of contamination that may have spread from those addresses," they are incorrect. First, Moving Defendants fail to cite any case law standing for that proposition, and, in any event, RID has not "solely" defined these facilities based on street addresses. Rather, RID has alleged facts as to the size of those sites, the buildings and other structures on the site, the types of processes and operations conducted at those sites, and the use of VOC Contaminants. Second, RID has specifically alleged that the VOCs travel "downward" from these sites until they meet the groundwater table (TAC ¶ 52), which is hydrologically connected to the groundwater pumped by RID. (*Id.* ¶ 54.)

*LLC,* 714 F.3d 161 (4th Cir.2013) ("Other courts have determined the scope of a CERCLA facility based upon such factors as the scope of response actions, the EPA's determination of what land is included in a facility, where hazardous substances have been disposed of, and how the plaintiff defines the scope of the facility in the complaint."). Accordingly, the Court **DENIES** Moving Defendants' Motion to Dismiss on this basis.

### B. *Whether RID's MERA is actually eight separate response actions*

■ Next, Moving Defendants argue that the eight MERA wells actually constitute eight separate response actions.[5] (Dkt. # 732 at 8.) Moving Defendants suggest that "because the eight MERA Wells are distributed throughout the 27 square mile WVBA, the sources of contamination are almost certainly not the same for any of those eight wells." (*Id.*) Additionally, Moving Defendants argue that if this were a regional groundwater remedy case, the result may be different; however, because RID is "doing nothing more than treating the output from eight distinct wells," the MERA wells are actually eight separate response actions. Essentially, Moving Defendants argue that because RID's MERA is not a "regional groundwater remedy," the Court must deem RID's action as eight separate response actions—one for each well. However, Moving Defendants fail to direct the Court to any case law standing for this proposition. On the contrary, case law supports the treatment of RID's claim as a single § 107 cost-recovery claim. *See, e.g. Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.,* 791 F.Supp.2d 431, 483 (D.S.C.2011) *aff'd sub nom. PCS Nitrogen Inc. v. Ashley II of Charleston LLC,* 714

F.3d 161 (4th Cir.2013) ("The court finds that the contamination of the Site, which has caused the need for remediation constitutes a single harm.")

In order to demonstrate a prima facie case, RID need only demonstrate that a "release" or "threatened release" has caused the plaintiff to incur "response costs" that were "necessary" and "consistent with the national contingency plan." *See Ascon Props.,* 866 F.2d at 1152. RID need only plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. 544, 127 S.Ct. 1955. CERCLA does not define the term "response cost." However, "response" is defined to mean "remove, removal, remedy, and remedial action" and all "enforcement activities related thereto." 42 U.S.C. § 9601(25). The terms "remove" and "removal" are in turn defined to include "cleanup or removal" and "actions as may be necessary to monitor, assess, and evaluate the release or threat of release," as well as "disposal of removed material" and "such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment." 42 U.S.C. § 9601(23); *see Castaic,* 272 F.Supp.2d at 1062.

Here, RID has specifically alleged that in order to respond to the contamination and threatened contamination of RID's wells, RID voluntarily entered into an Agreement to Conduct Work between ADEQ and RID on October 8, 2009. (TAC ¶ 64.) The Agreement was to conduct (a) an Early Response Action ("ERA") to address certain RID groundwater wells and (b) a Feasibility Study for the WVBA WQARF Site. (*Id.*) RID asserts that "[t]he ERA is authorized under A.A.C. § R18–16–405, as it will protect and

---

**5.** At the hearing, the parties agreed that only four of the eight MERA wells were being

treated at this time.

provide a water supply by providing treatment at the most highly contaminated RID wells to remove VOCs that are contaminants of concern in regional groundwater at the WVBA Site that is protective of all RID current and reasonably foreseeable end uses." (*Id.* ¶ 67.) RID alleges that the ERA is "necessary" not only because of the wells that are currently impacted, but because additional RID wells are "threatened" by VOC contamination.[6] (*Id.* ¶ 68.) "Pursuant to the Agreement to Conduct Work with ADEQ and ADEQ's approved ERA," RID alleges it "has incurred and continues to incur response costs that are necessary and consistent with the NCP to implement the ERA and to address the contaminated groundwater that has impacted or threatens to impact RID's wells." (*Id.* ¶ 74.)

On September 2, 2011, the ADEQ approved RID's proposal for the "RID–95 Wellhead Pilot Treatment System Proposal," aimed at pumping and treating contaminated groundwater from four of the most highly contaminated RID wells. (*Id.* ¶ 75.) RID alleges that it "has incurred and continues to incur response costs consistent with the NCP to implement, operate, and maintain the agreed upon four wellhead treatment systems." (*Id.*) RID has alleged that these "response costs" were "necessary" and "consistent with the national contingency plan [NCP]." 42 U.S.C. § 9607(a)(4)(B). "Costs are 'necessary' if incurred in response to a threat to human health or the environment." *Ashley II,* 791 F.Supp.2d at 480 (D.S.C.2011) (citing *ITT Indus., Inc. v. Borgwarner, Inc.,* 700 F.Supp.2d 848, 880 (W.D.Mich. 2010)). RID has alleged that its response costs are necessary to protect human health and the environment from the groundwater contamination.

Moving Defendants ask the Court to treat each well as separate and distinct, thus requiring RID to allege facts attributing contaminants at each of Defendant's respective facilities to each of the individual wells currently being treated. The Court declines to do so. At the hearing, Defendants cited *Castaic Lake* in support of the argument that because each individual well must be treated as a "site," RID must allege sufficient facts linking each of Defendants' facilities to each individual well or "site." However, the Court finds *Castaic Lake* distinguishable.

In *Castaic Lake,* there were multiple plaintiffs including a county water district, two water companies, and a state lake water agency. 272 F.Supp.2d 1053. Specifically, although all of the water service areas and allegedly contaminated wells were found within the boundaries of the Castaic Lake Water Agency, the wells individually belonged to separate plaintiffs— Newhall County Water District, Santa Clarita Water Company, and Valencia Water Company. Thus, the plaintiffs in *Castaic Lake* argued that perchlorate originated at a nearby property and traveled in a spreading plume to contaminate the Newhall, Santa Clarita and Valencia Wells, respectively. *Id.* at 1057. In *Castaic,* considering the separate plaintiffs, it is logical to treat each plaintiff's well individually as a separate response cost action. Here, on the contrary, RID is the sole plaintiff and seeks to recover response costs associated in implementing a single MERA to remediate the contaminated groundwater in its district. The fact that only four wells are

---

6. Specifically, Arizona law provides that "in considering whether an early response action is necessary to protect or provide a supply of water because a well is threatened by contamination, a well located in the area within one-fourth mile upgradient, one-half mile cross-gradient and one mile downgradient of the areal extent of contamination at the site shall be presumed to be threatened by contamination." (*Id.* (citing A.A.C. § R18–16–405(I)).)

being treated at this time as part of the MERA does not render each well as a separate and distinct cost response action—rather, the "RID–95 Wellhead Pilot Treatment System Proposal," approved by the ADEQ to treat contaminated groundwater from four of the most highly contaminated wells in the Roosevelt Irrigation District was approved in order to, in part, "refine the capital and operation & maintenance (O & M) cost estimates with the ultimate intention of reducing ERA response costs." (Dkt. # 789 ¶ 75.) Thus, although four wells are treated at this time, the initiative was created to evaluate the feasibility of wellhead treatment "in lieu of more expensive centralized treatment," and to reduce *overall* response costs associated with the ERA. (*Id.*)

Based on the foregoing, the Court concludes that RID has adequately alleged that a "release" or "threatened release" has caused the plaintiff to incur "response costs" that were "necessary" and "consistent with the national contingency plan." *See Ascon Props.*, 866 F.2d at 1152. And, finding no reason why these "response costs" should be divided into separate claims, the Court **DENIES** Defendants' Motion to Dismiss on this ground.

### C. *Two-site CERCLA case*

Next, Defendants argue that this case is a "two-site" CERCLA case, and because RID has not pled factual allegations that connect any particular Moving Defendant's operations and alleged releases to each particular well that is being treated, RID has not demonstrated causation; thus,

RID's claim must be dismissed. (Dkt. # 732 at 10–12.)

■ Defendants cite *Kalamazoo River Study Group v. Rockwell International Corp.*, which states: "In a 'two-cite' case ... where hazardous substances are released at one site and allegedly travel to a second site, ... plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up." *Id.* 171 F.3d 1065, 1068 (6th Cir.1999). Even assuming this is a "two-site" case, the Court concludes RID has sufficiently alleged facts to establish the heightened causal connection required in such cases.[7]

First, again, the Court reminds that this is a Motion to Dismiss. The cases cited by Defendants do not involve motions to dismiss. In *Kalamazoo*, cited by Defendants, the Sixth Circuit Court of Appeals reviewed the district court's grant of summary judgment in favor of defendants. *Id.* The court affirmed, noting that "in this case, the evidence presented leaves a 'gap' that is simply too wide to allow a jury to speculate on the ultimate issue of causation." *Id.* at 1073. Thus, while the court in *Kalamazoo* stated that "plaintiff must *establish* a causal connection," even assuming the Sixth Circuit's *Kalamazoo* causation standard applies, here, on the contrary, RID would only need *allege sufficient facts* that demonstrate a causal connection between Defendants' release of hazardous substances and Plaintiff's response costs incurred in cleaning them up.[8] Moreover, as discussed in *United*

---

7. At the hearing, Plaintiff's counsel stated that with respect to the Defendants whose facilities are outside the WVBA WQARF Site, it would be a "two-site" case.

8. Defendants also quote *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F.Supp.2d 175, 186 (D.Conn.2009), which states that in a two-site

CERCLA case, the "plaintiff must provide some evidence linking its response costs to the targeted offsite release of contaminant." (*See* Dkt. # 732 at 11.) Again, in *Innis*, the court evaluated a motion for summary judgment, not a motion to dismiss. *Innis*, 629 F.Supp.2d at 176 (concluding that "[l]acking

*States v. Washington State Department of Transportation,* the causation standard espoused in *Kalamazoo* is perhaps inconsistent with the "minimum casual nexus" most courts require under CERCLA; rather, the court in *Washington* expressed support for the causation approach set forth in *Castaic Lake* as more consistent with the CERCLA objectives. *See United States v. Wash. State Dept. of Transp.,* No. 08–5722RJB, 2010 WL 4723718, at *3 (W.D.Wash. Nov. 17, 2010) (citing *Castaic Lake,* 272 F.Supp.2d at 1066).

Although it discusses summary judgment, *Castaic Lake* is instructive on the causation analysis relevant to the motion to dismiss stage. In *Castaic Lake,* the court summarized:

> [I]n a two-site CERCLA case, the plaintiff meets its burden on summary judgment if it (a) identifies contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and (c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site. If the plaintiff meets this burden, the defendant must then proffer evidence sufficient to create a genuine issue of fact as to its inability to disprove causation.

*Castaic Lake,* 272 F.Supp.2d at 1066.

Here, as to each Defendant, RID has alleged facts as to each of these: RID has alleged (1) that specific VOC Contaminants affect its groundwater wells, (2) that the same VOC Contaminants were released at the Defendants' sites, and (3) a "plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site" exists.

As to the "plausible migration pathway," RID has alleged that (1) upon reaching the groundwater table at each of the Defendants' sites, the VOC Contaminants dissolve into the uppermost aquifer where groundwater movement within the region is predominantly controlled by RID's well-pumping (TAC ¶ 54); (2) the contaminated groundwater in all three regional sites is hydrologically connected to the groundwater pumped by RID (*id.*); (3) the commingled plumes of contaminated groundwater underlying the Defendants' facilities located within the M–52 Site and the WCP Area Sites flow toward and enter the WVBA Site in response to RID's well-pumping from groundwater wells located in the WVBA Site (*id.*); and (4) the WVBA WQARF Site and the adjacent WCP Area Sites and M–52 Site are all impacted by multiple VOC Contaminants forming a large, commingled plume that is "collectively one of the largest contaminant plumes in the country" (*id.* ¶ 55). More specifically, RID has alleged that according to the ADEQ's RI Report, "[c]ontributors to this commingled plume include industrial facilities and contaminated groundwater from the east, as regional groundwater flow is generally westward." (*Id.* ¶ 45.) RID has included in its Complaint a map demonstrating the direction of the groundwater flow and the relative positions of the sites and RID's wells— thus demonstrating the groundwater plumes impacting and threatening RID's wells and their relative location in relation to the migration of the groundwater. (*Id.* ¶ 49.)

Accordingly, at this stage of litigation, the Court concludes that RID has alleged sufficient facts to demonstrate a causal

---

evidence of causation, Innis Arden's claims must fail, and so the Defendants are entitled to summary judgment"). Here, in contrast, RID need not present any *evidence* linking its response costs to the targeted off-site release, but rather must only *allege sufficient facts* demonstrating the same.

link between VOC Contamination at Defendants' off-site facilities and the VOC Contamination of its groundwater wells. Therefore, the Court **DENIES** Defendants' Motion to Dismiss on this basis.

## II. *Moving Defendants' Individual Arguments*

Although each Defendants' individual arguments generally overlap the Defendants' joint arguments that have been rejected by the Court, the Court will address each of their specific arguments in turn.

### A. *Kinder Morgan and Prudential Overall Supply[9] Specific Arguments*

Kinder Morgan argues (1) that RID fails to allege any description of a Kinder Morgan "facility," and (2) that RID has provided no allegations concerning how the Kinder Morgan operations could have contributed to contamination at each of the eight MERA Wells. (Dkt. # 732.) Essentially, Kinder Morgan presents the same arguments by Moving Defendants that have been argued and rejected: (1) RID fails to specifically allege a "facility," and (2) RID fails to prove a sufficient causal connection between its response costs and the Defendants' sites.

As discussed above, RID has sufficiently alleged a "facility" as to each Defendant, including Kinder Morgan. RID has adequately alleged specific facts to demonstrate the first element of its CERCLA claim: a "facility" as defined by 42 U.S.C. § 9601(9). The Court rejects Kinder Morgan's argument that a facility must be "defined by the boundaries of any contamination at and migrating from the site." (Dkt. # 732 at 13.)

As to Kinder Morgan's argument that RID "has an obligation at the pleadings stage to allege some factual basis as to how the Kinder Morgan operations are tied to each of the eight MERA Wells found in eight separate locations," (*id.*), as discussed above, the Court concludes RID has done so. First, for the reasons stated above, the Court rejects the argument that each of the eight wells must be treated a separate response claim. Second, even assuming RID must allege a connection as to how Kinder Morgan's operations are tied to each of the MERA Wells, the Court concludes RID has done so.

RID has alleged facts demonstrating a "plausible migration pathway by which the contaminants could have traveled from the defendant's facility to the plaintiff's site," by alleging that the VOC Contaminants from each of Defendants' sites has traveled downward, coming in contact with the water table, and then migrating through the hydrologically connected groundwater to form a commingled contaminated plume affecting RID's groundwater wells in the WVBA.

Based on the foregoing, the Court **DENIES** the motion to dismiss on this basis.

### B. *Alcoa Specific Arguments*

Alcoa argues that (1) RID does not allege that Alcoa, as the parent corporation of Reynolds, is liable for Reynolds' alleged actions and (2) RID does not include enough factual content to support its conclusory claim of a hazardous substance release or threatened release from the Alcoa facility. (Dkt. # 732 at 15.)

"It is a general principle of corporate law deeply 'ingrained in our economic and

---

**9.** Because Prudential Overall Supply's location is less than a mile north of the Phoenix Tank Farm where Kinder Morgan operates, Prudential Overall Supply asserts that the arguments made by Kinder Morgan are equally applicable to Prudential Overall Supply, Prudential Overall Supply joins those arguments in full. (Dkt. # 732 at 25.)

legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods,* 524 U.S. 51, 64, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). Indeed "when (but only when) the corporate veil may be pierced, may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions." *Id.*

■ To demonstrate a prima facie case of CERCLA liability, RID must demonstrate that Alcoa falls into one of the four categories of PRPs under CERCLA. See *Carson Harbor Vill.,* 433 F.3d at 1265. The only applicable category here is that Alcoa is "the owner and operator of a facility." *See* 42 U.S.C. § 9607(a)(1). Although this subsection is written in the conjunctive, it has been interpreted in the disjunctive. *Ashley II,* 791 F.Supp.2d at 446 n. 6. To be considered an "operator," a party "must do more than stand by and fail to prevent the contamination." *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Cal. Living Trust,* 32 F.3d 1364, 1367 (9th Cir.1994). On the contrary, "[i]t must play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management." *Id.* As *Bestfoods* makes clear, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution, whether that person is "the facility's owner, the owner's parent corporation or business partner, or even a

saboteur who sneaks into the facility at night to discharge its poisons out of malice." *Bestfoods,* 524 U.S. at 65, 118 S.Ct. 1876. "If any such act of *operating* a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability." *Id.* (emphasis added).

Here, however, Alcoa did not operate the facility; in fact, Alcoa did not even come to be involved in the facility until 2000, when it took ownership of Reynolds.[10] The alleged releases occurred prior to the closing of the Reynolds plant in 1983. (TAC ¶ 83.) Thus, Alcoa can only be classified as a present "owner."

■ RID has not pled any of the exceptions to the general rule that Alcoa, as a parent corporation, is not liable for the actions of a subsidiary.[11] Accordingly, the Court **GRANTS** Alcoa's Motion to Dismiss RID's claim. The Court, however, will provide RID an opportunity to amend its claims.

### C. *APS Specific Arguments*

APS first argues that RID has failed to sufficiently plead its claim against APS because it has not alleged a release or threatened release of a hazardous substance occurred. (Dkt. # 732 at 19.) Specifically, APS argues that RID has merely alleged that APS "used" chlorinated solvents, but has not pled that APS conducted a "release." (*Id.*)

10. As discussed above, the Court has taken judicial notice of Reynolds' merger as a wholly owned subsidiary of Alcoa, as evidenced by Reynolds' Form 8–K announcing its May 3, 2000 merger with Alcoa, which was filed with the Securities and Exchange Commission on May 15, 2000.

11. The exceptions to the general rule include (1) direct involvement in the controversy at

issue, (2) joint venture, (3) alter ego, or (4) unity of control. *See U–Haul Intern., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* No. CV–10–1047–PHX–SMM, 2011 WL 9111, at *3 (D.Ariz. Jan. 3, 2011) (discussing the exceptions to the general rule that parent corporations are not liable for acts of their subsidiaries).

■ However, in addition to alleging that APS used VOCs including PCE, TCE, and TCA in the maintenance area to repair, maintain, lubricate, degrease and clean automotive parts and other activities, RID also alleged that as documented in the APS Focused RI Report, PCE and TCE were detected in soil gas samples beneath the facility. (TAC ¶¶ 218, 218.) In addition, RID alleged that groundwater investigations conducted at the APS facility beginning in 1997 confirm the presence of TCE, PCE, and TCA in the groundwater beneath the facility. (*Id.* ¶ 219.) Thus, RID did not merely allege that VOCs were used, but also included facts alleging a release. APS's motion to dismiss on this basis is denied.

Next APS argues that RID has not alleged any facts regarding any link between APS's site and RID's affected wells. (Dkt. # 732 at 20.) However, as discussed above, RID has alleged facts demonstrating a "plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site," by alleging that the VOC Contaminant from each of Defendants' sites has traveled downward, coming in contact with the water table, and then migrating through the hydrologically connected groundwater to form a commingled contaminated plume affecting RID's groundwater wells in the WVBA. Further, RID has specifically alleged that the VOCs released at the APS facility are the same contaminants for which RID has incurred response costs. (TAC ¶ 221.) Accordingly, APS's motion to dismiss is **DENIED.**

### D. *Meritor Specific Arguments*

Meritor argues that RID fails to sufficiently plead its claims against Meritor because "[a]lthough the ERA has been abandoned by the RID and replaced with the MERA, the RID generally alleges

facts against all defendants associated with the ERA; however, fails to distinguish what proposal (ERA or MERA) supports the allegations" (Dkt. # 732 at 21.) Because neither the ERA nor the MERA is identified in specific allegations against Meritor, Meritor asserts that this renders RID's pleadings inadequate.

■ However, as RID points out in its Response, RID seeks to recover both the ERA and MERA costs in this action. (Dkt. # 760 at 25; TAC ¶ 1.) RID initially undertook the ERA, but then modified it to respond under the MERA to address the VOC contamination impacting its groundwater supply; thus, the ERA was simply modified by the MERA ("Modified Early Response Action"), not "abandoned." In any event, Meritor does not cite any authority for the proposition that the failure to specifically reference an MERA in its allegations against a defendant renders a plaintiff's pleadings inadequate.

Meritor also argues that allegations of groundwater generally moving in a westerly direction are insufficient to state a claim. (Dkt. # 732 at 22.) However, RID did not simply allege that groundwater moves in a westerly direction; rather, RID alleged that the WVBA Report identifies Meritor and the 15th Street Facility as a potential source of the hazardous substances that have been released and have migrated into the WVBA Site where RID's groundwater wells draw water from. (TAC ¶ 212.) Specifically, it is undisputed that Meritor's facility is located in the OU3 portion of the M–52 Superfund Site; the WVBA RI Report states that the groundwater data in the WVBA indicates that groundwater contamination originates from the OU3 area east of Seventh Avenue and flows into the WVBA WQARF site from the east. ("WVBA RI Report," Dkt. # 760, Ex. 1 at 4–7.)

Based on the foregoing, the Court concludes RID has alleged sufficient facts demonstrating a plausible migration pathway by which the contaminants could have traveled from Meritor's facility to the area in which RID's groundwater wells are located; thus, the Court **DENIES** Meritor's motion to dismiss on this basis.

### E. *Nucor Specific Arguments*

Nucor argues (1) the WOC Report does not support RID's allegations that contamination from the WOC has impacted its irrigation wells, and (2) the WVBA RI Report does not "confirm" that contaminated groundwater associated with the up-gradient WOC Site is entering the WVBA from the north. (Dkt. # 732 at 23.)

Specifically, Nucor asserts that as depicted in the map attached to the WOC Report, the extent of contamination from the WOC was estimated to have migrated only slightly south of Thomas Road, where it is believed to have reached a "state of stagnation," suggesting that the plume would travel no further south. Thus, because the nearest MERA Well is approximately two miles south of Thomas Road, the WOC Report does not support RID's allegations that contamination from the WOC has impacted its irrigation wells. (*Id.*)

However, in the third amended complaint, RID alleges as follows:

The WOC RI Report indicates that VOCs released to soils at the WOC migrate[ ] to the water table where the VOCs become incorporated in groundwater. The WOC RI Report further states that the TCE in the SWGS moves off site and migrates to the south-southeast where the lateral extent of contamination has not been defined. Groundwater containing TCE in the LSGS moves to the southwest. The WVBA Site is south of the WOC Site. The WVBA RI

Report confirms that contaminated groundwater associated with the upgradient WOC Site is entering the WVBA from the north. The VOCs in groundwater contamination at the WOC Site and shown to migrate to the WVBA Site are the same WVBA Site contaminants of concern for which RID has incurred response costs. . . .

(TAC ¶¶ 290, 291.) RID has at least alleged sufficient facts to support a "cognizable legal theory" that contamination from Nucor's facility, and other facilities in the WOC Site, is entering the WVBA Site where RID pumps its groundwater. Nucor's allegation that a map, generated in 2004, estimates the contamination "to have migrated only slightly south of Thomas Road" while the nearest RID Well is located two miles south of Thomas Road, does not conclusively render it implausible that the contamination may have entered the WVBA from the north. And, in any event, the 2004 WOC Report provides that the "lateral extent of VOC contamination has not been defined," and, due to a variety of factors, "is *believed* to be reaching a state of stagnation." (Dkt. # 732, Ex. 1 at 47 (emphasis added).) Thus, in any case, the WOC RI Report did not conclusively state that the contamination from the VOC Site reached a state of stagnation as Nucor infers.

Nucor also makes an argument that when looking at RID's map as a "worst case scenario," it would still be physically impossible for contamination from West Central Phoenix to have had any impact on the majority of the MERA Wells that are located on the eastern half of the WVBA WQARF Site. (*Id.* at 24.) However, as discussed above, the WOC RI Report and the WVBA RI Report directly contradict this—RID has alleged that these reports demonstrate that contaminants from the WOC Site are migrating into the WVBA

from the north, affecting the groundwater from which RID's wells pump.

The Court concludes RID has plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. The Court therefore **DENIES** Nucor's motion to dismiss.

### F. *Semiray Specific Arguments*

Semiray first argues that it cannot be liable because it is only the current tenant and there are no specific actions of Semiray that could give rise to CERCLA liability for historical contamination for which Semiray is not alleged to have released, is not alleged to be an owner for, and for which there is no other allegation of any specific actions or relationship between Semiray and the contamination which is currently managed and controlled by Joray pursuant to ADEQ orders. (Dkt. # 732 at 26.)

Indeed, "[p]otentially responsible parties are not limited to parties who were the cause in fact of the contamination." *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 327 (2d Cir.2000). However, CERCLA does not "automatically assign liability to every party with any connection to a contaminated facility." *Id.* Certainly, "if the lessee is an active user and polluter of the property, imposition of CERCLA liability seems particularly appropriate;" however, a different question is presented when imposing "owner" liability upon a lessee. *Id.* at 328. "Lessees may frequently be liable as operators but most lessees are not owners within the meaning of § 9607(a)." *Id.* at 329.

RID makes no allegations as to why Semiray, as a current lessee, should be held liable for contamination of the Site by a previous operator other than that the operations between the previous operator (Joray) and Semiray "are similar to those previously conducted by Joray." (*See* TAC ¶ 61.) It is not alleged that Semiray, as the current lessee, released hazardous substances or was involved in Joray's alleged release of substances. Additionally, although it is not readily apparent when Semiray leased the premises, Semiray contends that the contamination occurred "long before Semiray ever leased the facility."[12] (*See* Dkt. # 732 at 26.)

Therefore, the Court **GRANTS** Semiray's motion to dismiss on this basis. The Court however, will provide RID an opportunity to amend its claims with regards to Semiray.

### CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Moving Defendants' Motion to Dismiss. (Dkt. # 732.)

The Motion is granted in part with respect to Semiray and Alcoa and RID's claims against Semiray and Alcoa are **DISMISSED.** However, the Court **GRANTS** RID leave to amend its claims against Semiray and Alcoa. RID shall file an amended complaint alleging necessary facts if such facts exist with respect to these Defendants within sixty (60) days of the filing of this Order.

The Motion is **DENIED** with respect to all other Defendants.

IT IS SO ORDERED.

---

12. RID does not appear to dispute this, instead ostensibly arguing that Semiray's status as a current lessee, alone, is enough to establish its liability as a PRP under CERCLA.

(*See* Dkt. # 760 at 29 ("Semiray is alleged to be the current lessee of a facility at which several releases of VOC contaminants occurred since as early as 1980.").)